# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Jul 02, 2018

IN RE:                                    )
                                          )
HEDMAN, Daniel Earl,                      )        **Case No. 17-11035-R**
                                          )        **Chapter 7**
                    Debtor.               )
_____

BARRETT BROS., LLC, an                    )
Oklahoma Domestic LLC, and                )
RAY BARRETT, an individual,               )
                                          )
                    Plaintiffs,           )
                                          )
vs.                                       )        **Adv. No. 17-01036-R**
                                          )
DANIEL EARL HEDMAN,                       )
                                          )
                    Defendant.            )

## <u>MEMORANDUM OPINION</u>

Before the Court is the Complaint filed by Plaintiffs Barrett Bros., LLC, and Ray Barrett (collectively, the "Barretts") against Debtor/Defendant Daniel Earl Hedman wherein the Barretts seek an order excepting their claims against Mr. Hedman from discharge. A trial on the merits was held on May 31, 2018.

Prior to trial, the Court had sanctioned Mr. Hedman pursuant to Rules 16(f) and 37(c) of the Federal Rules of Civil Procedure (made applicable in this proceeding by Bankruptcy Rules 7016 and 7037) for failing to cooperate in preparing a joint report, failing to appear at a scheduling conference, and failing to provide initial disclosures required by Rule 26(a) of the Federal Rules of Civil Procedure (made applicable by Bankruptcy Rule 7026). As a result, Mr. Hedman was precluded from presenting any defense at trial.

Barrett Bros., LLC, appeared at trial through its counsel of record and through one of its members, Jimmy Barrett ("Jimmy").[1]  Ray Barrett ("Ray") appeared through his counsel of record.  Mr. Hedman did not attend the trial, and he chose not to retain counsel to represent him at trial.  As evidence in support of their claims, the Barretts offered the testimony of two witnesses, Jimmy and Veronica Barrett ("Veronica"),[2] and documentary evidence, including the transcript of the Barretts' examination of Mr. Hedman taken on October 11, 2017, pursuant to Bankruptcy Rule 2004.

Upon consideration of the pleadings, the testimony and exhibits admitted at trial, arguments of counsel, and applicable law, the Court finds and concludes as follows:

## I.      Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(I) and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.     Findings of fact

Mr. Hedman filed a petition for relief under Chapter 7 of the Bankruptcy Code on May 25, 2017.  In his schedules, as amended, he listed Barrett Bros., LLC, and Ray Barrett, individually, as having contingent, disputed, unsecured claims in unknown amounts.

---

[1]Throughout this opinion, each of the Barretts will be referred to by his or her first name for convenience and to avoid confusion.

[2]Veronica testified on behalf of Barrett Bros., LLC, as its bookkeeper and custodian of records.  She stated that she was also familiar with Ray's books and records.

Mr. Hedman was the sole member of Patriot Grill, LLC.  Patriot Grill, LLC, and Mr. Hedman operated a restaurant called the Patriot Grill ("Grill")[3] from late 2013 to February 2017.  Mr. Hedman had prior experience in the restaurant business, but he was not particularly financially savvy.  Mr. Hedman exhausted his savings on start-up expenses, borrowed money to buy equipment and furnishings, financed the Grill's initial inventory through its supplier, and had no funds on hand on opening day.  Because the Grill opened without any operating capital, and its sales were insufficient to cover its expenses, Mr. Hedman resorted to funding operations with small high-interest bank loans and loans from family members, and with financial products known as merchant cash advances – high-interest, high-fee, short-term financing vehicles available to small businesses in need of quick cash.[4]  The Grill obtained lump-sum advances of projected future credit card receivables, and repaid the advances, with fees and/or interest, by authorizing the provider to make daily ACH withdrawals from the credit and debit card sales revenue deposited in the Grill's bank account.  Mr. Hedman admittedly failed to maintain conventional books and records for the Grill during the first eighteen months of business, and therefore he could not track net income or loss with any precision, but he nevertheless understood from the day he opened that the Grill's financial situation was precarious.[5]

---

[3]The Patriot Grill business and its owner, Patriot Grill, LLC, will be collectively referred to as the "Grill," unless the distinction between them is relevant.

[4]In some respects, this form of business financing is comparable to consumer payday lending.

[5]Transcript of October 11, 2017 Rule 2004 Examination of Daniel Hedman (Plaintiffs' Exhibit 3) (hereinafter "Tr.") at 80-81.

In March or April of 2014, the Grill retained an accountant, Warren Fisher, to communicate with the Oklahoma Tax Commission ("OTC") regarding the Grill's unpaid (and unsegregated) sales taxes that were collected during the first months of operation.[6] Mr. Hedman had "procrastinated on sales taxes, didn't really understand how to file them, and Mr. Fisher helped me get all of that straightened out."[7] The OTC allowed the Grill to make an initial partial payment of the delinquent sales taxes and pay the remaining balance over time. In order to make the initial payment, Mr. Hedman caused the Grill to obtain its first advance on credit card receivables.[8] Mr. Fisher continued to prepare and file the Grill's sales tax reports and made sure sales taxes were paid on a current basis through August 2015.[9]

Jimmy and Ray were frequent customers of the Grill. In April of 2015, Jimmy and Mr. Hedman discussed the Grill's need for operating capital and the fact that the burden of repaying the high-interest receivable advances had created a cash-flow quagmire.[10] Thus, Mr. Hedman was seeking a consolidation loan to pay off loans and receivable advances that had funded operations to that point.[11] Mr. Hedman told Jimmy that "if I didn't do this [obtain a consolidation loan], that I'd probably have to bankrupt. And [Jimmy] said, Well, we're not going to let that happen. And I felt like I had found an angel investor to step in where I

---

[6]Tr. at 54-55.

[7]Tr. at 55.

[8]Id.

[9]Tr. at 55-56.

[10]Tr. at 69-70. Mr. Hedman testified that he advised Jimmy that the effective interest rate on one of the receivable advances was 44%. Tr. at 69.

[11]Tr. at 70.

didn't have to keep taking these high interest loans."[12]  He advised Jimmy that he needed money immediately to make payroll.  Jimmy told Mr. Hedman  that he "didn't want to be [the Grill's] banker," but suggested that he "would be interested in being in a partnership."[13]

Soon after that discussion, on May 1, 2015, Jimmy gave Mr. Hedman a check drawn on the account of Barrett Bros., LLC (hereinafter "BB LLC"), in the amount of $6,000.00. Mr. Hedman issued BB LLC a receipt for the $6,000.00 "investment," with "the terms and conditions of the investment to be determined within 30 days,"[14] and deposited the $6,000.00 check into the Grill's payroll account.[15]  Prior to receiving the funds on May 1, 2015, Mr. Hedman had not made any representations to Jimmy about the finances of the Grill, other than those discussed above.[16]

Shortly after receiving the $6,000.00 investment, Mr. Hedman showed Jimmy an unspecified number of the Grill's daily sales reports ("Daily Sales Reports").  Mr. Hedman may have represented to Jimmy that the business was a "goldmine," or Jimmy interpreted the Daily Sales Reports to indicate that the business was a "goldmine."[17]  Veronica was of the

---

[12]Tr. at 70.

[13]Testimony of Jimmy Barrett; FTR at 9:41.  See also Tr. at 72.

[14]Plaintiffs' Exhibit 8-B.

[15]Plaintiffs' Exhibit 10-A at 3 and 8.  The Grill had two bank accounts.  It appears that cash receipts were deposited into what the parties called the operating account.  Operating account statements for the months January 2015 through September 2015 were admitted as Plaintiffs' Exhibit 9.  Cash and credit card and ACH receivables were deposited into what the parties called the payroll account.  Payroll account statements for the months May 2015 through July 2015 were admitted as Plaintiffs' Exhibit 10.

[16]Testimony of Jimmy Barrett.

[17]It is unclear from the testimony who coined the term "goldmine."

opinion that the Daily Sales Reports shown to Jimmy in May 2015 were not accurate because the bank and financial statements Mr. Hedman later provided to the Barretts – in July 2015 – allegedly did not support the figures in the Daily Sales Reports.[18] The Daily Sales Reports on which Jimmy allegedly relied are not in evidence, however, so the Court cannot compare them with later-produced documents to make a finding as to the accuracy of the Daily Sales Reports.[19]

After Jimmy's initial investment, Mr. Hedman drafted a document listing the Grill's operating expenses and debts, and what appears to be a rough outline of a plan to get the business back on its feet. Jimmy identified the document as Plaintiffs' Exhibit 17-E and testified that it was a document he relied on in deciding to further invest in the Grill. Plaintiffs' Exhibit 17-E does not have a title or heading, but the Court will refer to the document as the "Proposed Business Plan," although neither the parties nor any witness referred to it as such.

The Proposed Business Plan set forth a list of past due bills, outstanding unpaid checks, and overdrawn checking accounts that needed immediate attention and totaled approximately $25,000.00 (the "Past Due Debts"); a list of outstanding advances on credit card receivables in the amount of approximately $24,000.00 ("Credit Card Advance Debt");

---

[18]In July 2015, accountant Fisher prepared a Statement of Revenue and Expenses for the period of January 1, 2015, through April 30, 2015, which showed year-to-date gross sales receipts of $220,664.37 – an average of $55,166.09 per month, or $1,838.87 per day. Plaintiffs' Exhibit 16-I at 3.

[19]Moreover, at trial, there was no testimony as to the number of Daily Sales Reports provided, the particular dates of the reports, or the dollar amount of the sales represented therein, so the Court has no idea what sales figures Jimmy may have relied upon in May 2015.

a list of furnishings and equipment the Grill needed that would cost approximately $10,700.00; and a desired "Cushion" for future operating expenses of approximately $15,000.00.[20]  The sum of these items was $75,000.00, and next to the $75,000.00 figure someone wrote by hand "49%."[21]

The Proposed Business Plan noted other outstanding debts totaling $30,269.04 as follows: "Loan from Marla" in the amount of "$24,000.00 5% interest pay whenever able - personal"; debt to "Tankersly Equipment" in the amount of "$3,170.90 No interest pay $100 when we order - $400/mo"; and "AHB Loan" in the amount of "$3,098.14 Pay $150 per month."[22]

On the right side of the Proposed Business Plan are two charts.  One appears to calculate monthly, weekly, and daily payments required to service a loan of $84,000.00 at 12% interest over terms of one to five years.  The other chart purports to show the amount the Grill was paying at that time on the $24,000.00 Credit Card Advance Debt on a monthly, weekly, and daily basis via automatic debits from the Grill's bank account.  The chart purports to show that debt service on the Credit Card Advance Debt was $10,270.00 per month.

The Proposed Business Plan also appears to describe phases of a long range plan as follows:

---

[20]Plaintiffs' Exhibit 17-E.

[21]Id.  At his Rule 2004 examination, Mr. Hedman testified that "at the time the funds were exchanged, we had a handshake agreement to do 49 percent of my LLC for $75,000." Tr. at 72.

[22]Id.

Phase 1 - Stabilize the business
Phase 2 - Prepare new combined business entity
Phase 3 - Design and prepare building concept
Phase 4 - Build new Patriot Grill location
Phase 5 - Develop franchising concept
Phase 6 - Begin franchising[23]

Significantly, nothing in the Proposed Business Plan purports to represent the Grill's income or its profitability.  Jimmy testified that he decided to invest another $25,000.00 in the Grill based upon the document's representation that the Grill needed $25,000.00 to pay the Past Due Debts.

So, on May 6, 2015, Jimmy wrote a check drawn on the account of BB LLC in amount of $25,000.00, Mr. Hedman again issued a receipt for the "investment" that anticipated "the terms and conditions of the investment to be determined within 30 days,"[24] and the funds were deposited into the Grill's operating account.[25]  Jimmy testified that Mr. Hedman represented that he was going to use the $25,000.00 payment "to get everything current" by paying the Past Due Debts described in the Proposed Business Plan.[26]  Jimmy testified that he decided not to give Mr. Hedman any more money after that because he began to believe that Mr. Hedman had "conned" him into believing that the Grill was or would be

---

[23]Id.

[24]Plaintiffs' Exhibit 8-A.

[25]Plaintiffs' Exhibit 9-F at 1 and 5.

[26]Mr. Hedman corroborated that he and Jimmy agreed that the $25,000.00 would be used to pay the "situation critical" or "most pressing" debts.  Tr. at 73-74.

8

profitable. Jimmy did continue to spend time at the Grill over the next several months, however, performing maintenance and learning the business.[27]

Veronica testified that Mr. Hedman did not use the $25,000.00 investment for the purposes represented, and instead deposited the funds in the Grill's operating account and spent the funds on operating expenses and his own personal expenses. As one example of the alleged misuse of the funds, Veronica testified that the operating account was overdrawn by more than $3,000.00 at the time the $25,000.00 investment was deposited. But the Past Due Debts that Jimmy testified he intended to pay *included* two overdrawn bank accounts as line items.[28] Jimmy was or should have been aware from the Proposed Business Plan that the $25,000.00 investment would be used to cover the overdrafts as well as checks that had already been written but had not yet been presented to the bank for payment.[29]

Veronica further testified that Mr. Hedman used the funds for personal needs, car payments, credit cards, medical office visits, personal counseling, and his wife's business.[30] Upon review of the Grill's bank statements, however, the Court finds that most, if not all, of

---

[27]Tr. at 99-100. After negotiations regarding the terms of the investment broke down, the Barretts billed the Grill for the repairs in the amount of $3,526.94. Plaintiffs' Exhibit 8-F.

[28] Plaintiffs' Exhibit 17-E. Past Due Debts included overdrawn bank accounts in the amounts of $3,469.02 and $379.50.

[29]The list of Past Due Debts included "Outstanding Checks" in the amount of $4,213.33.

[30]The relevant bank statements reflect one credit card payment on May 14, 2015, to Capital One in the amount of $1,000.00. Plaintiffs' Exhibit 9-F, at 2. The Grill's financial statements reflect debt to Capital One as a short term liability, so it appears that the LLC had a Capital One account. Plaintiffs' Exhibits 16-A through 16-L. There is no evidence that the Grill paid Mr. Hedman's personal credit cards or that he charged personal expenses to the Grill's Capitol One card.

9

the transactions in the relevant time period appear to be related to the Grill's business. Payees include the Grill's landlord, employees, vendors, suppliers, tradespeople, credit card processors, lenders/factors, insurers, utilities, tax creditors, advertisers, accountants, etc. Veronica did not point to any particular transaction that she believed was not a legitimate business expense, and the Court did not see any obviously personal expenses, such as car payments, medical bills, or expenses related to another business reflected in the relevant bank statements.[31]

Veronica also testified that she believed that two cash transfers from the Grill's operating account in the amounts of $1,000.00 and $2,000.00 landed in Mr. Hedman's personal account. The bank statements indicate, however, that a $1,000.00 "Telephone Transfer Debit" was made from the Grill's operating account on May 18, 2015, and received in its payroll account as a $1,000.00 "Telephone Transfer Credit" on the same day. A similar transfer in the amount of $2,000.00 was made from the operating account and received by

---

[31]Mr. Hedman's wife did business as Good News Marketing. Tr. at 101. The Grill reimbursed Good News Marketing for costs incurred in doing promotional work for the Grill. Tr. at 101. Two checks were written to Good News Marketing during the relevant period - one on June 2, 2015, in the amount of $250.00 for "Internet mktg svcs" and one on July 11, 2015, in the amount of $350.00 for "Facebook fees." Plaintiffs' Exhibits 9-G at 4 and 9-H at 10. These checks were written and paid long after BB LLC's $25,000.00 cash infusion had been exhausted.

the payroll account on June 1, 2015.[32]  There is no credible evidence that cash transfers were made from the Grill's bank account into Mr. Hedman's personal account.[33]

In any event, another document prepared by Mr. Hedman, admitted as Plaintiffs' Exhibit 17-F, indicates how each of the Past Due Debts listed on the Proposed Business Plan was addressed after the $25,000.00 investment was deposited on May 7, 2015.  According to this document, as of May 8, 2015, each of the Past Due Debts had been paid or otherwise covered (*i.e.*, sufficient deposits were made to offset overdrafts and outstanding checks) except for April sales tax and business insurance, both of which were noted as not yet due, and the cost of inspecting and cleaning a hood, which had not yet been done.[34]  The relevant bank statements corroborate what is represented on Plaintiffs' Exhibit 17-F,[35] and also reflect that the sales taxes were in fact paid on May 22, 2015.[36]

---

[32]Plaintiffs' Exhibit 9-F at 2-3; Plaintiffs' Exhibit 10-B at 2-3.  In addition to these transfers, Mr. Hedman wrote a $5,000.00 check on the operating account and deposited it into the payroll account on May 7, 2015.  Those funds covered overdrafts and outstanding checks written on the payroll account.

[33]Veronica also testified that after the Barretts invested in the Grill, Mr. Hedman began to issue payroll checks to himself.  The relevant bank statements reflect payroll checks to Mr. Hedman in the following amounts: $448.36 on May 15, 2015 (Plaintiffs' Exhibit 10-B at 11); $822.66 on May 29, 2015 (Plaintiffs' Exhibit 10-C at 9); $822.66 on June 26, 2015 (Plaintiffs' Exhibit 10-C at 18); and $1,000.00 on July 10, 2015 (Plaintiffs' Exhibit 9-H at 10). The operating account statement also reflects a cash withdrawal of $1,102.00 on May 13, 2015 (Plaintiffs' Exhibit 9-F at 6). There is no evidence that Mr. Hedman agreed not to draw a salary while negotiating the the terms of the investment.

[34]Plaintiffs' Exhibit 17-F.

[35]Plaintiffs' Exhibit 9-F and 10-B.

[36]Plaintiffs' Exhibit 9-F at 2 (reflecting an electronic transaction labeled "OK TAX PMT" in the amount of $5,528.26 on May 22, 2015). As stated above, Mr. Fisher tended to the Grill's sales tax obligations by filing sales tax reports and making timely payments.

Plaintiffs' Exhibit 17-F also indicates that as of May 8, 2015, the Credit Card Advance Debt remained at about $24,000.00. Next to the $24,000.00 figure on Plaintiffs' Exhibit 17-F is a hand-written note: "ASAP next wk."[37] The $24,000.00 Mr. Hedman hoped to obtain from the Barretts to retire the Credit Card Advance Debt did not materialize, however.

On June 18, 2015, Ray gave Mr. Hedman a check in the amount of $6,000.00, his first investment in the Grill. Ray made additional investments of $5,000.00 on June 29, 2015, and $4,000.00 on August 7, 2015. Mr. Hedman again deposited the funds in the Grill's bank accounts and provided Ray receipts stating that "the terms and conditions of the investment to be determined within 30 days."[38] Because Ray did not testify, the Court is unable to determine what representations or documents, if any, he relied upon in parting with his funds.

From May through September 2015, the Barretts and Mr. Hedman tried in vain to come to an agreement as to terms of the Barretts' investment. Mr. Hedman provided the Barretts with periodic spreadsheets that loosely outlined the current financial condition of the Grill's business. These indicated that the Grill continued to accumulate debt, that it was unable to pay ordinary operating expenses such as equipment leases and utilities as they became due, and that bank accounts continued to be overdrawn.[39]

At some point, the Barretts requested the Grill's tax returns and financial statements, but no such documents existed.[40] So Mr. Hedman retained accountant Fisher to prepare the

---

[37]Plaintiffs' Exhibit 17-F.

[38]Plaintiffs' Exhibits 8C, 8D and 8E.

[39]Plaintiffs' Exhibits 17-A, 17-G through 17-M.

[40]Tr. at 57, 92-93.

Patriot Grill, LLC's 2014 tax return, and monthly financial statements for January 2015 through July 2015[41] from raw data provided by Mr. Hedman.[42]  Compiling these accounting reports and returns took some time; they were not completed until July 2015, at which point the parties learned that in 2014, the Grill suffered a net loss of more than $30,000.[43]  Mr. Hedman testified that he assumed that the Grill was losing money even before he read the financial reports "based on the fact that I never had any money.  I assumed I was losing money.  Exactly how and where, I did not know."[44]

Sometime in July 2015, while the parties were in the midst of negotiations, Paychex stopped processing the Grill's payroll because the electronic debit submitted to the Grill's account for payroll taxes was declined for insufficient funds.[45]  The Grill continued operating and paying employees but it failed to segregate the corresponding payroll taxes.  Sometime in September 2015, the Grill retained Profit Solutions, Inc. to take control of payroll

---

[41]Plaintiffs' Exhibit 16.

[42]Tr. at 57, 61-62, 92-93, 97.  Mr. Hedman testified that he had "folders, envelopes of receipts and invoices and things that had never been put into any kind of accounting format, and Jim and Ray wanted financials and I didn't have any.  I didn't have a tax return. I didn't have anything."  Tr. at 57.  Mr. Hedman testified that he emailed documents to Mr. Fisher as well as dropping off hard copies of documents such as "bank statements, invoices, those kinds of things."  Tr. at 62.  When asked whether he believed the reports and tax returns were accurate, he stated "I'm not an accountant.  I really don't have an opinion on his accuracy."  Id.  But he did believe that the information he provided to Mr. Fisher was accurate.  Id.

[43]Plaintiffs' Exhibit 15-A (K-1); Plaintiffs' Exhibit 16-E (December 2014 Statement of Revenue & Expenses - Income Tax Basis).

[44]Tr. at 58.

[45]Tr. at 45.

processing and tax withholding.[46]   Between July and September 2015, however, the Grill accrued withholding tax liabilities for the third quarter of 2015 that it could not pay.

At some point, Ray told Mr. Hedman that the "original deal was off the table."[47] Further negotiations ensued, but, as Mr. Hedman testified, the parties could not "get the legal side of it to work out as far as their attorney got involved and then I got an attorney and then we seemed to struggle with meeting of minds."[48]   In September 2015, the parties' attorneys began negotiating the terms under which Mr. Hedman would reimburse the Barretts, at which point Mr. Hedman believed the transaction was converted from an investment to a loan.[49]

On September 28, 2015, Mr. Hedman signed a "proposed agreement" naming himself as "Owner" and Ray and Jimmy as "Lenders," in which he agreed to amounts owed to Ray and Jimmy and agreed that "a payment schedule will be prepared based on the above totals at 10% interest with a 2 year payback," subject to the execution of a standard loan agreement to be prepared by the Barretts' attorney and reviewed by Mr. Hedman's attorney "prior to final signatures" ("Proposed Agreement").[50]   The Barretts' counsel prepared some loan documents, which are not in evidence, and transmitted them to Mr. Hedman.  On November

---

[46]Tr. at 44.

[47]Tr. at 85.  It is unclear what the "original deal" was, although in his Rule 2004 examination and in pleadings, Mr. Hedman has consistently asserted that the Barretts agreed to pay $75,000 for a 49% interest in Patriot Grill, LLC.  The Barretts did not present any evidence as to what they believed they were entitled to in exchange for their investment, other than some unspecified ownership interest in the Grill's business.

[48]Tr. at 87-88.

[49]Tr. at 93.

[50]Plaintiffs' Exhibit 18.

15, 2015, Mr. Hedman sent the Barretts a letter explaining why he was refusing to sign the loan documents,[51] but nevertheless began making small payments to the Barretts, which continued through April 2016.[52]  On April 14, 2016, the Barretts sued Mr. Hedman and the Grill, seeking recovery of $49,526.94 on three alternative counts: indebtedness, unjust enrichment, and specific performance of the Proposed Agreement.[53]

Meanwhile, the Grill remained in business.  In October or November of 2015, the Grill retained Profit Solutions to maintain its books and records.[54] At some point in time, Profit Solutions went back and prepared balance sheets and profit/loss statements for the periods of August 2015 and September 2015.[55]  The profit/loss statements show minimal monthly gross income, *i.e.*, $7,100.00 in August and $8,700.00 in September, as compared to monthly gross incomes of $45,000.00 to $71,000.00 reported in the January to June 2015 profit/loss statements and corroborated by the Grill's bank statements.[56]  Notwithstanding the

---

[51]Plaintiffs' Exhibit 4 at 12, and Exhibit 11.  In the letter, Mr. Hedman objected to executing the documents on behalf of Patriot Grill, LLC, because (1) the viability of the Grill was uncertain as it had not finalized negotiations with the Oklahoma Tax Commission and the IRS regarding payment of delinquent taxes; (2) the Grill was entering its slow season and the LLC would be unable to make the monthly payments called for in the notes; and (3) the notes apparently required Mrs. Hedman's signature.  Plaintiffs' Exhibit 11. In another letter, Mr. Hedman also objected to interest accruing as of the date of the investments and to the Barretts monitoring the Grill's books and bank accounts.  Plaintiffs' Exhibit 12. Mr. Hedman did offer to sign a personal guarantee, however.  Id.

[52]Plaintiffs' Exhibit 4 at 12.

[53]Plaintiffs' Exhibit 6.

[54]Tr. at 56.

[55]Id.

[56]*Compare* Plaintiffs' Exhibits 16-K and 16-L *to* 16-F through 16-J.  See also Plaintiffs' Exhibits 9-A through 9-G; 10-A through 10-C.

purported reduction in income, the profit/loss statements reflect expenses consistent with expenses reported in the January through June periods.  Accordingly, the August and September statements show massive monthly operating losses – $57,000.00 in August and $53,000.00 in September.[57]

The Barretts contend that the profit/loss statements prepared by Profit Solutions are more accurate reflections of the Grill's income and profitability than those prepared by Mr. Fisher in July 2015, but the Court is skeptical, mainly because the statements indicate that the Grill continued to incur expenses of in excess of $60,000.00 per month.  It is undisputed that the Grill had no cushion in the form of cash or other assets that would allow it continue operating at such significant losses, and the statements do not reflect borrowing or investments to cover these expenses.  The Grill in fact continued operating through February 2017.[58]  In addition, the income components of the statements prepared in July 2015, which the Barretts contend are inflated, can be supported in large part by the deposits shown on the bank statements that are in evidence.

In June 2016, the Grill obtained a loan in anticipation of resolving its payroll tax delinquency with the IRS.[59]  In July, however, the IRS, however, froze the Grill's bank accounts and in August, it seized the freshly-borrowed funds, dealing the Grill another set-

---

[57]Id.

[58]Tr. at 14.

[59]Tr. at 53, 98; Plaintiffs' Exhibit 4 at 13.

back.[60]   The Grill ceased paying rent to its landlord[61] and its sales tax permit expired in

November 2016.[62]  The OTC advised Mr. Hedman that it would not renew the permit unless

all taxes were current, and gave him a deadline of February 11, 2017.[63]  Lacking the funds

to pay the taxes, Mr. Hedman closed the Grill on February 11, 2017, and left the equipment

and furnishings in the building.[64]  At that point, the Grill owed its landlord $22,341.00.[65]  Mr.

Hedman did not consult with the Barretts before he closed the Grill and left the equipment

in the building.

The landlord and his grandson, Chad, took over the leased space.   On February 20,

2017, Chad opened a new restaurant, the Patriot Café ("Café"), in the same space, and

recruited and employed Mr. Hedman and the Grill's staff to operate the Café.  The Café is

owned and operated by Patriot Café, LLC.   Mr. Hedman denied owning any interest in

Patriot Café, LLC,[66] and the Barretts did not produce any evidence that Mr. Hedman ever had

such an interest.  As the Café's manager/cook, Mr. Hedman prepares and serves the same

---

[60]Tr. at 98; Plaintiffs' Exhibit 4 at 13, 24.

[61]Tr. at 98.

[62]Tr. at 112.

[63]Id.

[64]Tr. at 111-16.

[65]Plaintiff's Exhibit 1, at 22 and 40, ¶ 18.  Paragraph ¶ 18 of Mr. Hedman's Statement of Financial Affairs discloses that he "transferred" the following property to the Café, operated by landlord's grandson, on February 20, 2017: "[G]rill, three fryers, six restaurant booths, assorted small wares and supplies.  Value: $2,000;" and that the landlord had a $22,341.00 rent claim.

[66]Tr. at 12.

menu items that were offered by the Grill.  The Barretts contend that Mr. Hedman conveyed the goodwill of the Grill – *i.e.,* Mr. Hedman's skills and experience, his relationships with customers, and trade secrets (menus and recipes) – to the Café for less than equivalent value. Mr. Hedman did not consult with the Barretts before accepting employment at the Café.

## III.    Conclusions of law

The Barretts assert claims under the "actual fraud" and "false pretenses" prongs of 11 U.S.C. § 523(a)(2)(A).[67]  They contend that Mr. Hedman committed actual fraud by causing the Grill, while insolvent, to transfer its assets, including goodwill, to the Grill's landlord for less than equivalent value.  The Barretts also contend that Mr. Hedman induced them to invest in the Grill under false pretenses by falsely representing that the business was a "goldmine" when in fact it had never been profitable, and by taking their money without any intention of granting them an equity interest in the Grill.

The Barretts further contend that Mr. Hedman presented them with written statements of the Grill's financial condition, including accounting reports, sales reports, payroll reports, cost analyses, bank statements and listings of outstanding debts, and that these written statements were materially false.[68]  Accordingly, they also seek to except their claim from discharge under § 523(a)(2)(B).

---

[67]Unless otherwise stated, all statutory references are to sections of the Bankruptcy Code, title 11 of the United States Code.

[68]The Barretts acknowledged that the evidence was insufficient to establish a claim under § 523(a)(4), and withdrew that claim at the conclusion of the trial.

The Barretts have the burden of proving each element of their claims by a preponderance of the evidence.[69]  Dischargeability exceptions are construed strictly against the creditor and liberally in favor of the debtor.[70]

### A.    Section 523(a)(2)(A) Claim for Actual Fraud:  Fraudulent Conveyance

Section 523(a)(2)(A) provides that "[a] discharge under [Chapters 7, 11, 12, or 13] of this title does not discharge an individual debtor from any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . actual fraud."[71]  The Barretts argue that Mr. Hedman defrauded them when he transferred all the Grill's assets, including goodwill, to the Café without receiving equivalent value in exchange with the intent of shedding the Grill's debt while continuing to control the business.  They cite, as a case with analogous facts, the recent United States Supreme Court case of Husky International Electronics, Inc. v. Ritz ("Husky").[72]

In the Husky case, plaintiff Husky sold products to a corporation of which defendant Ritz was a major shareholder and director.  At a time when the corporation owed Husky in excess of $150,000.00, Ritz caused the corporation to transfer funds to other entities Ritz owned or controlled without receiving anything in return, rendering the corporation insolvent, thereby executing a classic fraudulent conveyance.  Husky sued Ritz in state court

---

[69]Grogan v. Garner, 498 U.S. 279, 291 (1991).

[70]Bellco First Fed. Credit Union v. Kaspar (In re Kaspar), 125 F.3d 1358, 1361 (10th Cir. 1997).

[71]11 U.S.C. § 523(a)(2)(A).

[72]136 S.Ct. 1581 (2016).

pursuant to a Texas statute that allows a creditor to collect a corporation's debt from its shareholder if that shareholder caused the corporation to perpetrate an "actual fraud" on the creditor for the personal benefit of the shareholder.[73]   Instead of defending, Ritz filed bankruptcy.  Husky then filed an adversary proceeding to except the debt from discharge under the "actual fraud" prong of § 523(a)(2)(A).  The trial court held that Ritz was personally liable to Husky for the corporation's debt to Husky under the Texas statute, but concluded that the debt was nevertheless dischargeable because the debt itself was not "obtained by . . . actual fraud," *i.e.*, the debt pre-existed the alleged fraudulent activity.[74]  On appeal, the Fifth Circuit agreed that the debt was dischargeable, but for a different reason. Because Husky did not allege or prove that Ritz made any false representation in order to induce Husky to extend credit, said the Fifth Circuit, Husky failed to establish an essential element of a claim of "actual fraud" under § 523(a)(2)(A).[75]  The precise issue on appeal to the United States Supreme Court was whether the Fifth Circuit erred in holding that "a necessary element of 'actual fraud' is a misrepresentation from the debtor to the creditor."[76]

The Supreme Court reversed the Fifth Circuit, holding that "[b]ecause we must give the phrase 'actual fraud' in § 523(a)(2)(A) the meaning it has long held, we interpret 'actual

---

[73]Id. at 1585; Tex. Bus. Orgs. Code Ann. § 21.223(b).

[74]Id. at 1585.

[75]Id. at 1586.

[76]Id.

fraud' to encompass fraudulent conveyance schemes, even when those schemes do not involve a false representation."[77]

> [T]he common law . . . indicates that fraudulent conveyances, although a "fraud," do not require a misrepresentation from a debtor to a creditor. As a basic point, fraudulent conveyances are not an inducement-based fraud. Fraudulent conveyances typically involve "a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration." [Resolution Trust Corp. v.] BFP, 511 U.S. [531], at 540–541, 114 S.Ct. 1757 (citing Twyne's Case, 3 Co. Rep. 80b, 76 Eng. Rep. 809 (K.B. 1601)); O. Bump, FRAUDULENT CONVEYANCES: A TREATISE UPON CONVEYANCES MADE BY DEBTORS TO DEFRAUD CREDITORS 31–60 (3d ed. 1882). In such cases, the fraudulent conduct is not in dishonestly inducing a creditor to extend a debt. It is in the acts of concealment and hindrance. In the fraudulent-conveyance context, therefore, the opportunities for a false representation from the debtor to the creditor are limited. The debtor may have the opportunity to put forward a false representation if the creditor inquires into the whereabouts of the debtor's assets, but that could hardly be considered a defining feature of this kind of fraud.[78]

Although the term "actual fraud" is broad enough to encompass fraudulent transfer schemes, debts of the perpetrator of a fraudulent transfer are not *per se* nondischargeable under § 523(a)(2)(A). The creditor must still establish that the debt was "obtained by . . . actual fraud." Because a fraudulent transfer occurs *after* the transferor incurred debt to the hindered creditor, not before,[79] that creditor cannot claim to have been duped or tricked into extending credit on account of the fraudulent transfer. The Supreme Court concedes this point – that the transferor's pre-existing debts are not "obtained by" the fraud.[80] But it notes that a

---

[77]Id. at 1590.

[78]Id. at 1587.

[79]Id. at 1589.

[80]Id.

*transferee* (Ritz's wholly owned corporations, perhaps)[81] might be liable to the creditor by participating in the scheme, and that liability may be nondischargeable in the *transferee's* bankruptcy.

> It is of course true that the transferor does not "obtain[]" debts in a fraudulent conveyance.  But the recipient of the transfer–who, with the requisite intent, also commits fraud—can "obtain[]" assets "by" his or her participation in the fraud.  See, e.g., McClellan v. Cantrell, 217 F.3d 890 (C.A.7 2000); see also *supra*, at 1587- 1588. If that recipient later files for bankruptcy, any debts "traceable to" the fraudulent conveyance, see Field, 516 U.S., at 61, 116 S.Ct. 437; *post*, at 1591, will be nondischargable under § 523(a)(2)(A). Thus, at least sometimes a debt "obtained by" a fraudulent conveyance scheme could be nondischargeable under § 523(a)(2)(A). Such circumstances may be rare because a person who receives fraudulently conveyed assets is not necessarily (or even likely to be) a debtor on the verge of bankruptcy, but they make clear that fraudulent conveyances are not wholly incompatible with the "obtained by" requirement.[82]

In this case, the Barretts parted with their money long before Mr. Hedman closed the Grill, left the equipment in place, and took a job at the Café.   There is no evidence that Mr. Hedman had any ownership interest in the Café, so there is no argument that he could be liable as a transferee.  Assuming without deciding that Mr. Hedman did transfer assets to his landlord or to the Café for less than equivalent value and with the intent to defraud creditors, *i.e.,* committed actual fraud as alleged by the Barretts, Mr. Hedman's pre-existing debts to the Barretts were not "obtained by" that particular fraud and therefore cannot be excepted from discharge under the principles established in Husky.

---

[81]Id. n.3 ("Ritz was both the transferor and the transferee in his fraudulent conveyance scheme[.] We take no position on that contention here and leave it to the Fifth Circuit to decide on remand whether the debt to Husky was 'obtained by' Ritz' asset-transfer scheme.")

[82]Id. at 1589.

**B.** **Section 523(a)(2)(A) Claim for False Pretenses**

Section 523(a)(2)(A) also excepts from discharge "any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – false pretenses [or] a false representation . . . other than a statement respecting the debtor's or an insider's financial condition."[83]  The Barretts argue that in order to induce them to invest in the Grill, Mr. Hedman had falsely represented that the business was "a goldmine" when in fact it had never been profitable.  To the extent Mr. Hedman made this representation or any other oral representation regarding the profitability of the Grill, such an utterance is an oral statement respecting the Grill's financial condition, which is not actionable under § 523(a)(2)(A).[84]

The Barretts also argue that they turned over funds to Mr. Hedman for the purpose of "paying debts that were most pressing," i.e., the Past Due Debts, but that Mr. Hedman deposited the funds in a "general operating account that was used for general operations and personal purposes."[85]  While Veronica gave several examples of how she believed Mr. Hedman misused the Barretts' funds, the weight of the evidence supports the finding that Mr. Hedman did in fact use the funds to pay the Past Due Debts.

---

[83]11 U.S.C. § 523(a)(2)(A).

[84]See, e.g., Lamar, Archer & Cofrin, LLP v. Appling, 136 S.Ct. 1752 (2018) (a creditor cannot except from discharge under § 523(a)(2)(A) a debt for money, goods, services, or extensions of credit obtained by fraud if the allegedly false statement upon which the creditor relied was an oral statement respecting the financial condition of the debtor or an insider).

[85]Joint Report (Adv. Doc. 14) at 2, ¶ 3.

The Barretts also contend that Mr. Hedman misled them into believing that their "investments" would result in them acquiring some equity interest in Patriot Grill, LLC, and that Mr. Hedman never intended to grant them such an interest but instead, intended to treat the contributions as loans, thus inducing them to part with money under false pretenses.

Mr. Hedman signed a receipt each time he received funds from BB LLC and Ray providing that "the terms and conditions of the investment to be determined within 30 days."[86]  Implicit therein was a promise by Mr. Hedman to perform an act in the future – to negotiate with Jimmy and Ray in good faith to try to come to an agreement regarding allocation of the ownership of the business of the Grill.  A breach of the promise does not constitute fraud under § 523(a)(2)(A), but proof that Mr. Hedman had no intention of sharing ownership of the Grill with the Barretts at the time he took their checks might.  Promising to do something in the future is a representation.  If the promisor did not intend to follow through, the representation was false.  Such a false representation is actionable under § 523(a)(2)(A) if a creditor justifiably and detrimentally relied on the promise.

The Bankruptcy Appellate Panel of the Tenth Circuit addressed the distinction between a fraudulent promise and a simple breach of a promise (*i.e.*, a breach of contract), and the type of proof required to establish a fraudulent promise, in Chevy Chase Bank FSB v. Kukuk (In re Kukuk).[87]  Quoting the RESTATEMENT OF TORTS, the appellate panel observed that "[a]n intention not to perform under an agreement cannot be 'established solely

---

[86]Plaintiffs' Exhibit 8.

[87]225 B.R. 778 (B.A.P. 10th Cir. 1998).

by proof of . . . nonperformance.'"[88]  The panel also quoted COLLIER ON BANKRUPTCY as follows:

> The failure to perform a mere promise is not sufficient to make a debt nondischargeable, even if there is no excuse for the subsequent breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions.[89]

Without an admission by the debtor that his promise was an empty gesture, the Court must look at the totality of the circumstances to assess whether he resolved not to fulfill the promise at the outset.[90]

In this case, the evidence before the Court is insufficient to find that Mr. Hedman never intended to grant the Barretts some type of equity interest in the Grill.  At his Rule 2004 examination, Mr. Hedman acknowledged that he initially told Jimmy he needed a consolidation loan to relieve the Grill from the debilitating Credit Card Advance Debt.  But after Jimmy offered to help prevent the Grill from bankruptcy by investing in the business rather than loaning money, Mr. Hedman welcomed the offer, and his conduct thereafter was consistent with an intention to honor his promise to work toward a joint venture with Jimmy.  Within days of the first payment, Mr. Hedman drew up the Proposed Business Plan to show Jimmy the financial state of the Grill.  Mr. Hedman admitted to "a handshake agreement"

---

[88]Id. at 786, *quoting* RESTATEMENT OF TORTS, § 530(1), comment *d*.  See also Bank One Columbus, N.A. v. Schad (In re Kountry Korner Store), 221 B.R. 265, 272 (Bankr. N.D. Okla. 1998) ("fraud 'must be clearly distinguished from the mere failure to perform a promise, which is not fraud but breach of contract'").

[89]Id. *quoting* COLLIER ON BANKRUPTCY, ¶ 523.08[1][d] at 523–44 (1998) (footnote omitted).

[90]Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1375 (10th Cir.1996).

where he would sell 49% of the LLC to the Barretts for $75,000.00. The handwriting on the Proposed Business Plan corroborates such an agreement. Mr. Hedman's written plan for the future of the Grill included "[s]tabiliz[ing] the business" and "[p]repar[ing] new combined business entity."[91] Each receipt restated Mr. Hedman's acknowledgment of the Barretts' "investments." Consistent with good faith efforts to negotiate an agreement, Mr. Hedman employed accountant Fisher to prepare the financial reports the Barretts and their advisors requested, and provided the Barretts with periodic spreadsheets and other records to keep them apprised of the Grill's financial status. Jimmy was onsite at the Grill, observing business activities, and repairing and renovating the premises.

The Barretts engaged a lawyer to assist them in evaluating options for taking part ownership of the Grill, and Mr. Hedman also eventually retained a lawyer, but after several months of back and forth, the parties simply could not agree on how to structure a jointly-held entity to operate the Grill. Four months after the Barretts' first investment, the parties' lawyers began negotiating the terms under which the Grill would reimburse the Barretts. Mr. Hedman testified that in his mind, it was at that point that the transaction converted from an investment to a loan.

Although Jimmy testified that he believed Mr. Hedman was "stringing them along," the preponderance of the evidence weighs in favor of finding that Mr. Hedman did intend to enter into some manner of joint ownership with the Barretts, and thus the Barretts failed to prove that Mr. Hedman accepted their money under "false pretenses."

---

[91]Plaintiffs' Exhibit 17-E.

### C.      Section 523(a)(2)(B) Claim for False Written Statement of Financial Condition

Section 523(a)(2)(B) excepts from discharge "any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . (B) use of a statement in writing –  (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive."[92] As discussed above, statements respecting a debtor's financial condition are excluded from the statements actionable under § 523(a)(2)(A).  For debts induced by such statements to be nondischargeable, the creditor must meet the more stringent requirements of § 523(a)(2)(B).   Under § 523(a)(2)(B), the allegedly false statement respecting financial condition must be in writing, and the creditor's reliance upon the false statement must be reasonable, an objective standard, as opposed to the subjective justifiable reliance standard applicable under § 523(a)(2)(A).[93]

The Barretts argue that Mr. Hedman presented them with written statements of the Grill's financial condition, including "accounting reports, sales reports, payroll reports, cost analys[es], bank statements, and listings of outstanding debts,"[94] and that these written statements were false.  They contend that Mr. Hedman provided the written materials with

---

[92]11 U.S.C. § 523(a)(2)(B).

[93]Lamar, 138 S.Ct. at 1763 n.6.

[94]Complaint (Adv. Doc. 1) at 5, ¶ 24.

the intent to deceive the Barretts as to the financial condition of the Grill.[95]  They assert that they "reasonably relied on such written statements in making the decision to turn over funds"[96] to Mr. Hedman.  Because this case involves multiple transactions over the course of several months, each investment will be evaluated in relation to the written statements of financial condition available at the time.

On May 1, 2015, Jimmy gave Mr. Hedman $6,000.00 based solely upon Mr. Hedman's oral representations that the business was over-leveraged and that he could not make payroll that week.  Jimmy admitted at trial that he had not seen any written statements of financial condition prior to May 1, 2015.  Thus, Jimmy did not actually rely upon any written statement in making the $6,000.00 investment.

Between May 1, 2015, and May 6, 2017, Mr. Hedman showed Jimmy some Daily Sales Reports that indicated that the business was a "goldmine."  Mr. Hedman also drafted the Proposed Business Plan and discussed it with Jimmy.  Based upon those disclosures, on May 6, 2015, Jimmy gave Mr. Hedman $25,000.00.  Because the Daily Sales Reports are not in evidence, the Court cannot evaluate whether the contents of the reports was materially false.  Further, the Barretts did not prove that any part of the Proposed Business Plan was materially false.  That document did not purport to show income or profitability.  In fact, it showed that the Grill was in dire straits, overdrawn, unable to make payroll, bogged down

---

[95]Id., ¶ 26.  In the Complaint, the Barretts also contend that Mr. Hedman used written statements of financial condition to deceive them as to the "nature of the funds as investment in an ownership interest, or as an unsecured loan," id., but they did not present any evidence connecting written statements to any deception concerning the "nature of the funds."

[96]Id., ¶ 25.

by high-interest short term debt, all as Mr. Hedman had orally represented to Jimmy previously. The plan clearly indicated that the Grill needed $25,000.00 just to keep the doors open on a short term basis, and Mr. Hedman in fact used the $25,000.00 investment for overdrafts, expenses for which checks had already been written, and past due bills. Jimmy was not deceived by the Proposed Business Plan.

All other written statements of the Grill's financial condition – Mr. Hedman's spreadsheets, the tax returns and financial statements prepared by Mr. Fisher, etc. – were not in existence until *after* Jimmy made his last investment on May 6, 2015, so he could not have relied upon them, reasonably or otherwise, in investing or extending credit.

On June 18, 2015, Ray gave Mr. Hedman $6,000.00. Because Ray did not testify, the Court cannot determine whether Ray relied upon any written statement of the Grill's financial condition. On June 29, 2015, Ray gave Mr. Hedman $5,000.00, and on August 7, 2015, Ray gave Mr. Hedman another $4,000.00. Again, without some evidence as to whether Ray saw or relied upon any written statements of financial condition provided by Mr. Hedman in making these investments, the Court cannot make any findings regarding actual or reasonable reliance.[97]

Accordingly, the Barretts have failed to prove the elements required to except their debts from discharge under § 523(a)(2)(B).

---

[97]At trial, the Barretts argued in closing that the financial statements and tax returns prepared by Mr. Fisher in July 2015 were false, as evidenced by the August 2015 and September 2015 financial statements prepared by Profit Solutions in late 2015 that reflected massive net operating losses. The only transaction that could have been influenced by the financial statements prepared by Mr. Fisher was Ray's investment of $4,000.00 on August 7, 2015, but since there is no evidence of reliance, the Court need not make a determination as to the accuracy of the statements prepared in July 2015.

## IV.    Conclusion

For the reasons stated herein, the Court concludes that the Barretts have not met their burden of proving that the debts Mr. Hedman owes them are excepted from discharge under § 523(a)(2)(A) or (B).   A separate judgment will be entered consistent with this Memorandum Opinion.

**SO ORDERED** this 2nd day of July, 2018.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE